[No. 29606. Department One. April 16, 1946.]

NORTHWEST SAVINGS & LOAN ASSOCIATION, *Respondent,* v. DAVID LOCKWOOD, *as Director of the Department of Finance, Budget & Business,* and KINGSTON LISTER, *as Supervisor of Savings and Loan Associations, Appellants.*[1]

[1]Reported in 168 P. (2d) 379.

*The Attorney General* and *R. A. Moen, Assistant,* for appellants.

*Charles T. Peterson* and *S. A. Gagliardi,* for respondent.

ROBINSON, J.—When this appeal was taken, this cause was properly captioned as above. It has, however, been brought to our attention that, some months before the appeal was argued in this court, David Lockwood had been succeeded in office by Rogan Jones, and that Kingston Lister had been succeeded in office by George L. Barner. It has further been brought to the attention of the court that Mr. Jones has recently been succeeded in office by Jack Ballew. Messrs. Lockwood and Lister having been made parties in their respective official capacities only, Messrs. Ballew and Barner, as their successors in office, have inherited the defense of the cause, and are now, in their official capacities, the nominal appellants here.

The primary purpose of the action was to secure a declaratory judgment. Under a general prayer "for such other, further or different . . . relief as the court may direct," the trial court, after making the required

declarations, entered a judgment which, in effect, is a writ of mandate, commanding the supervisor of savings and loan associations to issue the plaintiff a current license to do business. No oral evidence was taken at the trial. The trial court arrived at its findings and conclusions by considering stipulated facts. It is to be regretted that the limitations of space forbid the quotation of the stipulation in its entirety; for the major question involved is so close and narrow that some seemingly, relatively unimportant and subsidiary fact might well be thought sufficient to tip the scales.

The plaintiff savings and loan association was incorporated under the laws of this state in 1904. In 1933, the legislature passed a comprehensive act, forty-eight pages in length, relating to the organization, management, and supervision of savings and loan associations. Laws of 1933, chapter 183, p. 711. It is § 33 of that act (Rem. Rev. Stat. (Sup.), § 3717-33 [P.P.C. § 453-79]), with which we are chiefly concerned on this appeal. It reads as follows:

"Any association may, when such action is ordered and directed by a majority in amount of those present and voting at an annual or special shareholders' meeting called for the purpose, and if such action shall be approved by the supervisor, disregard notices and rights of priority therein, and pay to all of the members their holdings on a ratable and proportionate basis, and the supervisor shall have power to cause such proportionate payment to be made by any association, and such method of payment may be discontinued by like action on the part of the shareholders and with the consent of the supervisor, and in the case where the supervisor has ordered such action he may cancel such order, and the supervisor shall have power to order ratable payment on such percentage basis as he may deem advisable to notice holders in the order of their filing, and to cancel such order."

It is contended by the appellants that this court may take judicial notice that, at the time the above legislation was enacted, the state and the entire nation were in the grip of a financial crisis, and savings and loan associations, as well as other financial institutions, were subject to extraordinary demands by way of withdrawals, and it is reason-

ably inferable that chapter 183 of the session laws of that year, and particularly § 33 thereof, above quoted, was enacted for their protection.

It is stipulated that July 8, 1935, plaintiff had 1,157 shareholders, owning shares of a par value of $510,281.03; that, on that date, it had on file applications for withdrawals aggregating approximately $48,750, and, on said July 8th, the association adopted the following resolution:

"WHEREAS, Northwest Savings & Loan Association of Tacoma, Washington, (hereinafter referred to as the Association) has on file written notices or applications for withdrawal of shares aggregating approximately $48,750.00, and

"WHEREAS, it would be to the best interests of all of the shareholders of the Association that such notices and the rights of priority therein be disregarded and payments made to all members of the Association on a ratable and proportionate basis subject to the exceptions hereinafter provided for,

"Now, THEREFORE, in accordance with the authority of Section 33 of the 'Savings and Loan Act', being Chapter 183, Laws of 1933, State of Washington, and subject to the approval of the State Supervisor,

"BE IT RESOLVED by the shareholders of the Association in regular annual meeting assembled on this 8th day of July, 1935, as follows:

"1. That all notices or applications for withdrawal of shares now on file or hereafter filed by members of the Association, and all rights of priority therein, be disregarded and that all members of the Association be paid their shareholdings on a ratable and proportionate basis, such payments to be upon such percentage basis as may from time to time be determined and ordered by the Board of Directors of the Association.

"2. That the Board of Directors be and it is hereby empowered, when voting any resolution for payments to shareholders as hereinabove provided for, to include in such resolution a provision fixing a minimum payment to each shareholder, such minimum, however, at each distribution not to exceed the sum of $100.00 nor the balance of the shareholdings of the member.

"3. That it is not the intention of the shareholders by this resolution to in any way limit or restrict the present practice of the Association of permitting withdrawals by

any member of sums not in excess of twenty-five dollars per month, such payments being reported to the State Supervisor monthly in the manner required by Section 32 of the Savings and Loan Act."

A copy of the resolution was sent to the then supervisor of savings and loan associations, from whom the plaintiff's board of directors received the following prompt reply:

"Gentlemen:

"We have a copy of the Resolution adopted by your shareholders at their regular annual meeting held on July 8, 1935, whereby they request the supervisor to issue an order directing the funds hereinafter accumulated for distribution to shareholders to be distributed on a pro rata basis, except as to the provision for emergency withdrawals under Sec. 32 of Chapter 183, Laws of 1933. Such an order would automatically cancel the existing notices of withdrawal, now totaling $48,750.00.

"*In consideration of the fact that such a distribution would be an equitable one, operating without favor to any shareholder,* I hereby, in accordance with the power vested in me by virtue of Section 33, Chapter 183, Session Laws of 1933, direct you to pay all withdrawals on a ratable basis. This order includes the right to disregard notices and rights of priority therein, and authorizes the repurchase of the shares of all members (those who have filed notices and those who have not) on a ratable and proportionate basis. *We interpret the order to mean that funds shall be distributed practically in the manner that liquidating dividends are distributed by an institution which in fact is in liquidation.* [Italics ours.]

"In issuing this order, I reserve the right to order the discontinuance of emergency payments to members at any time it shall appear that a preference in ultimate payment might become imminent.

"Dated this 10th day of July, 1935, at Olympia, Washington. (Signed) T. M. DONAHOE

"Supervisor, Division of Savings
"& Loan"

Upon the supervisor's approval of the resolution of July 8, 1935, the plaintiff association ceased doing business in a normal manner, and its activities from that time until July 12, 1943, are stipulated to have been as follows:

"(8) That prior to July 12, 1943, shareholders were paid

par or $100.00 per share on their shares, which was the amount of the original investment of such shareholders.

"(9) That during the period from July 8, 1935 to July 12, 1943 the current earnings of the Association, after payment of current expenses and making provision for reserve and contingent funds as required by law, were regularly paid semiannually as dividends to stockholders of record.

"(10) That the directors of plaintiff each held qualifying shares to the amount of $500.00 on account of which no payments were made other than dividends at the same rate paid to other shareholders.

"(11) That on July 12, 1943 and at all times since the following named persons, to-wit:

| | | |
|---|---|---|
| C. O. Lynn | S. A. Gagliardi | A. Van R. Schermerhorn |
| H. T. Hansen | I. C. Rowland | Dr. Harold N. Fowler |
| O. M. Pitzen | | |

constituted the Board of Directors or trustees of plaintiff, and each of said persons held qualifying shares to the amount of $500.00, on account of which qualifying shares withdrawal payments were not made, under the resolution of July 8, 1935.

"(12) That said persons above named, who constituted the board of directors or trustees of the plaintiff, were the only stockholders of record of said Association on July 12, 1943.

"(13) That at no time subsequent to July 8, 1935 did the association (plaintiff), after making provision for its contingent fund and also making provision for reserves under the direction of or with the approval of the Supervisor, have a net reserve in excess of 15% of its capital.

"(14) That on July 12, 1943, the contingent fund which had been theretofore from time to time set aside by the association with the approval of the Supervisor was $6,486.81 and the reserve for losses set aside with like approval of the Supervisor was $30,488.32 and the undistributed profits were $124.04.

"(15) That as of June 17, 1944, prior to the commencement of this action, the financial condition of plaintiff was as set forth in the balance sheet as of that date, as follows:

" 'ASSETS

| | |
|---|---|
| R. E. 2nd, Mortgage Loans | $ 20.00 |
| Furniture and Fixtures | 1.00 |
| Real Estate Contracts | 21,888.13 |
| Stock in Federal Home Loan Bank | 3,300.00 |
| U. S. Bonds and Notes | 8,000.00 |
| Cash on Hand and in Banks | 3,834.17 |
| TOTAL ASSETS | $37,043.30 |

28

" 'LIABILITIES

| | |
|---|---|
| Saving Shares | 3,500.00 |
| Current Net Income | 165.68 |
| Dividends Declared but Unpaid (on Director's Shares) | 70.30 |
| Trust Account—Unclaimed Distributions | 303.08 |
| Contingent Fund and Undivided Profits | 9,023.40 |
| Tax-Insurance Trust Account | 235.76 |
| Specific Reserves for Depreciation of Assets | 23,070.12 |
| Real Estate Income | 674.96 |
| TOTAL LIABILITIES | $37,043.30,' |

which, for all practical purposes, was substantially the condition of the association on July 12, 1943 and which also reflects generally its financial condition at this time."

It is further stipulated that, on July 12, 1943, the shareholders (and by the term "shareholders" is meant the seven persons named in paragraph (11) of the stipulation, above quoted), at a regular and duly called meeting, passed the following resolution and motion:

"BE IT RESOLVED THAT in accordance with Section 33 of the Savings and Loan Act, being Chapter 183, Laws of 1933 of the State of Washington, and subject to the approval of the State Supervisor, that the Resolution adopted by the shareholders at their regular meeting of July 8, 1935, providing that notices or applications for withdrawal of shares then on file or thereafter filed be disregarded and that all members of the Association be paid their shareholdings on a ratable and proportionate basis as determined and ordered from time to time by the Board of Directors, be and the same is hereby rescinded and that henceforth this Association operate in the normal manner relating to receiving of funds for investment in and payment of withdrawals of its shares, the making of loans and investments and all other activities as normally permitted and provided for under the Savings and Loan Act."

"Mr. Gagliardi then moved that the Association proceed to a normal transaction of business, that the Secretary be authorized to again receive funds for investment in shares of the Association and that funds of the Association be invested as from time to time directed or authorized by the Board of Directors."

It is further stipulated that a certain certified copy of the above resolution was sent to the defendants, who refused

to approve the action taken; that the plaintiff had paid all license fees and other charges due the state; that at no time had the plaintiff association paid in excess of two per cent of its capital for operating expenses; that, at all times after July 12, 1935, plaintiff has furnished and filed all reports required by law and made all publications so required; and that each and all of its trustees and officers named possessed the qualifications required by law to hold their offices or positions.

Naturally, the findings of fact are in accordance with the stipulated facts, above set out, and the content of the conclusions of law may be correctly inferred from the judgment entered. It was:

"ORDERED, ADJUDGED AND DECREED that the resolution adopted by the shareholders of Northwest Savings and Loan Association on the 8th day of July, 1935 set out in paragraph III of the Findings of Fact herein did not authorize and was not intended to authorize the liquidation of plaintiff association but was only intended and did authorize withdrawal of holdings on a ratable and proportionate basis rather than permitting withdrawals by the members in the order the applications for such withdrawals were made, and that said resolution was subject to being rescinded by a majority vote of the shareholders of plaintiff Association at an annual meeting or at a special meeting called for the purpose;

"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the resolution unanimously adopted by the shareholders of plaintiff association at the annual meeting July 12, 1943 rescinding said resolution of July 8, 1935 was and is in all respects regular and valid, and that the seven shareholders of record named in paragraph VIII of the Findings of Fact herein were the only shareholders authorized to participate in such stockholders meeting;

"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the proceedings of the plaintiff Association had at its regular meeting on July 12, 1943 are in all respects valid and regular and plaintiff is entitled to operate henceforth in a normal manner under the laws of the State of Washington relating to savings and loan associations and to receive funds for investment and to allow withdrawals of its shares and to make loans and investments and perform all other activities as are normally permitted and provided for with respect

to savings and loan associations under the laws of the State of Washington;

"It Is Further Ordered, Adjudged and Decreed that the action of defendant Kingston Lister, as Supervisor of Savings and Loan Associations of the State of Washington, in refusing to approve said resolution of plaintiff Association adopted on July 12, 1943, set forth in paragraph XI of the Findings of Fact herein, is arbitrary and capricious and said Kingston Lister, as such Supervisor of Savings and Loan Associations of the State of Washington is hereby ordered and directed to formally approve within ten (10) days from the entry of this Judgment said resolution;

"It Is Further Ordered, Adjudged and Decreed that the refusal of defendant Kingston Lister as Supervisor of Savings and Loan Associations of the State of Washington to issue to plaintiff, Northwest Savings and Loan Association, a corporation, a license to do business as a savings and loan association of the State of Washington was and is arbitrary and capricious and said Kingston Lister, as such Supervisor, is hereby ordered and directed to issue to plaintiff, Northwest Savings and Loan Association, a corporation, a current license to do business as a savings and loan association under the laws of the State of Washington upon receiving a proper fee therefor, such license to be issued within ten (10) days from the date of this judgment;

"And It Is Further Ordered, Adjudged and Decreed that jurisdiction of this proceeding is retained by the Court for such further proceedings as may be necessary to enforce the provisions of this judgment.

"It Is Further Ordered, Adjudged and Decreed that plaintiff have costs herein to be taxed."

The questions raised by the appellants' eleven formal assignments of error may be reduced to the following: (1) Was the trial court warranted in holding that the refusal of the supervisor to issue the license to resume business was arbitrary and capricious? (2) Assuming that the court could so find, had it the power in this—an action for a declaratory judgment—to mandatorily direct the supervisor to issue the license? (3) Did the court err in directing the taxation of costs against the defendants?

As introductory to a discussion of the first of these questions, it may be said that to realize the sweeping extent of the administrative powers granted to the supervisor of

savings and loan associations by chapter 183, Laws of 1933, one must read, or at least scan, the forty-eight pages of the act. The articles of a savings and loan association cannot be filed until the supervisor has approved them. He may refuse to permit their filing for a great number of reasons, enumerated in the statute, of which the most general is: if he determines that public necessity or convenience will not be served by allowing the proposed association to engage in business. No by-law can attain vitality without his approval. He may remove officers of an association for dishonesty, inefficiency, or inattention to business. Bonds of officers having custody of moneys are subject to his approval as to form and amount. He must approve action under § 33 of the act, which has been heretofore quoted and with which we are especially concerned in the case at bar. The appointment of appraisers is subject to his approval. Compromises of debts owing to the association must be reported to him in writing. Every association taking a real estate mortgage must deposit with him the mortgage and the notes secured thereby. When it is made to appear that the losses of the association exceed its reserves, the supervisor is given discretion to liquidate it, unless he prefers to call a meeting of the shareholders and submits to them the following questions:

"Shall such excess losses be charged pro rata against all classes of outstanding shares, except juvenile shares, and such association thereafter continue in business? Shall such association proceed to voluntary liquidation under its own management?"

If the majority approve voluntary liquidation, it is provided that the supervisor, in his discretion, shall at any time have power to take over and complete such liquidation. If, however, he determines to liquidate the association, the court in which the proceeding is instituted is required to appoint the supervisor as liquidator, "and no other person," and no court can appoint a receiver for an association or any other liquidator than as provided in the act. The supervisor is charged with the enforcement of the act and is given all powers necessary or convenient thereto, includ-

ing the power to cause the attorney general to prosecute or defend with respect to all litigation arising in connection therewith.

 The act, however, provides expressly that certain acts of the supervisor may be reviewed by the superior court of Thurston county, such as his refusal to file a by-law submitted to him, or his removal of an officer, or his reappraisal of property or investments of the association, and, in this last instance, it is further provided that the action of the superior court may be reviewed by the supreme court. Of course, it cannot be supposed that, by these specific provisions for court review, the legislature intended to deny to the courts the power to review other acts of the supervisor; but its intention to make the regulatory power of the supervisor as broad and exclusive as legally permissible seems clear and evident.

The courts, then, should not encroach upon the supervisor's powers, or take over his duties, or in any way interfere with his performance thereof, except in a very clear case—a case where it can say, with conviction, that his disposition of the matter in question cannot reasonably be regarded as one performed in the exercise of honest judgment but was merely arbitrary and capricious.

The heart of the controversy between the parties to the appeal can be best revealed by quoting from their respective briefs. In concluding their argument on the main question, the appellants say:

"Summarized, our position is this: That plaintiff is a member of a class of quasi public institutions founded for the purpose of mutual benefit who operate under strict statutory regulation; that with the deepening of the depression they were unable to pay their shareholders on demand, even though perfectly solvent (though they did not know it at the time), because their funds were invested in securities and mortgages not then due; that in order to protect them, their shareholders and the general public, the legislature in 1933 set up an unusual and extraordinary procedure whereby an association could discontinue its normal functions and proceed as if in insolvency, without actually being forced into insolvency; that plaintiff chose to follow this course, whereby their board of directors became

liquidating officers holding a fiduciary position to the shareholders; that the economic prosperity and consequent upturn in real estate values, together with the sound management of the board of directors, has made it possible for plaintiff not only to pay off the members at par, but leave a surplus over; that the fiduciary capacity of the board of directors requires them to split the surplus proportionately among those stockholders of record when the association began its *de facto* liquidation, or, in the alternative, give them an opportunity to vote and decide whether they will relinquish their interest in the surplus fund and allow plaintiff to resume business in a normal manner; that when the board of directors, as sole surviving members, adopted the 1943 resolution, they acted to the advantage of their own interest, not the interests of their fiduciaries, and consequently the 1943 resolution is illegal and void; that the supervisor of savings and loan, as regulatory agent and representative of the public, was duty bound to so declare it, and accordingly refused to place his approval thereon; that the trial court erred in finding the supervisor's action in so doing was arbitrary and capricious, and consequently the judgment should be reversed."

In opening the argument in its brief, under the caption of "The Question of Controlling Importance," the respondent says:

"As we view the case, there is but one question involved here, viz: Did the resolution of July 8, 1935, set in operation proceedings for the complete liquidation of plaintiff association, leading ultimately and inevitably to its complete dissolution and discontinuance of business as a going concern, or, on the other hand, was it a sort of retrenchment proceeding and a curtailment of activities for the purpose of tiding over until the affairs of the association were in a more satisfactory shape, whereupon it would resume business in a normal way, by permitting withdrawals of capital in the order filed, and the resumption of loans, etc.—a sort of moratorium or tiding over to get its house in order?"

The limitations of space preclude a full and adequate statement of respondent's argument. As we interpret it, it may be outlined as follows: (1) The steps taken by the association between the adoption of the resolution of July 8, 1935, and that of July 12, 1943, cannot possibly be con-

tended as constituting a liquidation, for several reasons: (a) They did not constitute a liquidation under the act because each of the two liquidating procedures therein provided, voluntary and involuntary, is based on insolvency, and the association was not insolvent. Furthermore, the procedure provided by this statute for voluntary or involuntary liquidation was not followed. (b) The resolution of July 8, 1935, did not, in terms, provide for liquidation, and in truth and in fact was enacted for the specific purpose of forestalling liquidation. (2) Every act done by the association after the enactment of the resolution of July 8, 1935, and until July 12, 1943, was in strict pursuance of the resolution of July 8, 1935, no other having been enacted, and it is inquired: How and when did the proceedings become a liquidation? In this connection, the respondent says, in its brief:

"For the purpose of testing the soundness of appellant's contention, assume that during the first five years following the adoption of the resolution of July 8, 1935, as many as 500 members took advantage of the emergency withdrawal feature of the resolution and of the statute, and voluntarily withdrew all of their deposits, having in the meantime received the usual annual or semi-annual dividends paid to all stockholders. Would these stockholders be in any different position than any other stockholder who had taken out his whole investment in the Association plus dividends to date of the closing of his account? We think not.

"Assume that on July 12, 1943, there had been 700 or 70 instead of 7 members who had not withdrawn the full amount of their shares and were still carried on the stockholders list. Could it be successfully contended that they were without power to rescind the original resolution and resume business in a normal way without the consent of those who had taken out all of their funds and long ceased to have any further interest in the institution? The mere fact that the seven directors, who are all men of substance and means, went on through and rode out the storm, each leaving $500.00 in the institution, which he stood to lose were it insolvent or couldn't be revived, does not to our mind change the application of the principle. If it would apply to the 700 or the 70 shareholders in the assumed situations, then by the same token it applies to the remaining seven shareholders."

We do not understand that appellants contend that the paying off of 1,150 of the 1,157 shareholders, pursuant to the 1935 resolution, constituted a statutory liquidation. They have in fact conceded that it was not, by referring to it as a "*de facto* liquidation" in the summary of their position heretofore quoted from their briefs. It is also apparent that the supervisor who approved the 1935 resolution did not regard the proposed action as a statutory liquidation. The order approving it has been quoted in full earlier in this opinion. After acknowledging the receipt of a copy of the resolution passed by the shareholders' meeting on July 8, 1935, ". . . whereby they request the supervisor to issue an order directing the funds . . . to be distributed on a pro rata basis," the order goes on to say:

"In consideration of the fact that such a distribution would be an equitable one operating without favor to any shareholder, I hereby in accordance with the power invested in me by virtue of section 33, chapter 183, Session Laws of 1933, direct you to pay all withdrawals on a ratable basis.

. . .

"*We interpret the order to mean that funds shall be distributed practically in the manner that liquidating dividends are distributed by an institution which in fact is in liquidation.*

"In issuing this order, I reserve the right to order the discontinuance of emergency payments to members at any time it shall appear that a preference in ultimate payment might become imminent." (Italics ours.)

It is, therefore, apparent that the then supervisor did not consider that the resolution contemplated a formal statutory liquidation. But is it not equally clear that he made it a condition of his approval of the distribution of the funds, as per the resolution, that they should "be distributed practically in the manner that liquidating dividends are distributed by an institution which in fact is in liquidation"? Had the word "practically" been omitted from the paragraph above italicized, the question before us would not require further discussion. But is it not a fair interpretation of the paragraph, as written, that the distribution was authorized on the condition that, in so far as practicable,

it should be governed by the rules and principles which would apply in the case of an institution in actual liquidation?

As the stipulation shows, in April, 1937, the supervisor furnished a copy of the 1935 resolution to the office of the then attorney general, and inquired whether or not the resolution gave the directors authority for "a definite liquidation." The attorney general said that it did not, pointing out that the procedure contemplated by the resolution did not comply with the requirements of chapter 183, Laws of 1933, governing the liquidation of solvent savings and loan associations. As we have just pointed out, no one seems to contend that the resolution contemplated a formal statutory liquidation.

After the residuary shareholders passed the resolution of July 12, 1943, and applied to the then supervisor for a license to do business, he, being in doubt as to what course he should take, propounded the following questions to the present attorney general:

"1. Is it permissible and proper for the Supervisor to approve the resolution adopted at the shareholders meeting of July 12, 1943?

"2. If not proper and it is the opinion of the Attorney General that the shareholders of record at the time the original resolution was passed July 8, 1935, should share in the surplus and reserves, is it the responsibility of the Supervisor to see that the remaining reserves are converted into cash and distributed as soon as feasible?

"3. The association in question has sent in a check for the renewal of its license fee for the year commencing August 1, 1943. Should a license be issued? If not, should such fee be accepted by the Supervisor as provided under Section 78 of our Savings and Loan Laws as amended by Section 4, Page 597, Laws of 1935?"

The opinion rendered was attached to the stipulation, and by reference made a part thereof. It consists of nine closely written, single-spaced pages, reciting the entire history of the matter and arriving at the following conclusion:

"Inasmuch as we are of the considered opinion that the directors were without authority to retire any shares until

full pro rata distribution had been made, we are forced to the conclusion that those who have not received such full pro rata distribution are still shareholders, wherefore it is our belief that the question propounded in your request of September 18, 1943, should be answered categorically as follows: It is neither permissible nor proper for the supervisor to approve the resolution adopted on July 12, 1943—it is his responsibility to see that the present reserves or surplus be proportionately distributed to all the shareholders as soon as possible—and that the license fee tendered for the year commencing August 1, 1943, should be accepted only in consideration of the requirement of Rem. Rev. Stat. Supp. 3717-78, *supra.*"

It is, of course, impossible in this opinion to even outline the argument which leads up to the conclusion above stated, but some idea of the theory upon which the opinion proceeds must be given; for, while we presume that an act done by a state officer, in strict accordance with the advice and approval of the state's attorney general, may be held to be "arbitrary and capricious," it would seem that such a holding could only be arrived at by concluding that the advice and opinion so acted upon were quite obviously unsound.

 The attorney general's opinion was based, generally upon the principle so briefly and aptly stated in *Rummens v. Home Sav. & Loan Ass'n*, 182 Wash. 539, 47 P. (2d) 845, 100 A. L. R. 570, as follows:

"The controlling principle of savings and loan associations being that of mutuality among its shareholders, all must fare alike, in that all burdens shall be borne equally, and profits shared equally, unless one class of shareholders has a superior equity."

(The mutual nature of such associations is declared and stressed in Laws of 1933, chapter 183, p. 748, § 86 [Rem. Rev. Stat. (Sup.), § 3717-86 (P.P.C. § 453-181)].)

The opinion, however, is largely grounded upon a construction of § 33 of the savings and loan act, considered in the light of this overruling principle, and in the light of various other provisions of that statute. In this connection, it is said, in part:

"As we view the matter, Rem. Rev. Stat. Supp. 3717-33,

*supra*, in authorizing a ratable distribution of funds to shareholders, contemplates that whatever funds the association has must be paid to the shareholders upon a proportionate basis without regard to the fact that such funds may be more or less than the aggregate value of the shares outstanding. We are of the opinion that the distribution resolution as approved by the director and as authorized by this section required of the directors that distribution continue upon a proportionate basis after the shareholders had received the full amount of their original share investment and that it did not lie in the power of the directors, when full payment of such original investment had been made, to depart from the authorized course of distribution and to consider that they were then retiring shares under Rem. Rev. Stat. Supp. 3717-37, *supra*.

"Moreover, we incline to the view that the interpretation given the matter by the former supervisor in his order approving the distribution resolution was correct in so far as he deemed that the funds were to be distributed as though the association were in fact in liquidation and this notwithstanding the fact that neither Rem. Rev. Stat. Supp. 3717-68 nor Rem. Rev. Stat. Supp. 3717-78, *supra*, was complied with. It is entirely conceivable to us that the directors and shareholders, faced, as they were, with a total of withdrawal notices that could not be conveniently honored, and perhaps uncertain as to whether the assets of the association could be reduced to cash in an amount more or less than the value of the outstanding shares, were not in position to determine upon a liquidation either on the theory of insolvency under Rem. Rev. Stat. Supp. 3717-68, *supra*, or on the theory of solvency under Rem. Rev. Stat. Supp. 3717-78, *supra*. Having elected for a distribution under Rem. Rev. Stat. Supp. 3717-33, *supra*, we consider it inescapable that the distribution on a ratable and proportionate basis called for in said section should have proceeded until each shareholder had received that proportion of all the assets of the association which bore to the ratio of his holding as against the total of shares outstanding, or until a majority of all of the resolving shareholders had decided otherwise."

The keystone of respondent's position is its contention that, as each shareholder accepted the par value of his shares, pursuant to the distribution made under the resolution of July 8, 1935, he forfeited all further interest in the assets of the association; or, to put it in another way, he abandoned

all his interest in the assets of the association to those shareholders who had not at that date cashed in their shares.

The stipulation contains no information as to the rate of withdrawals. That being the case, we cannot know how many shareholders the association may have had—under respondent's theory—on, say, January 1, 1940, or on any other date during the eight-year period between July 12, 1935, when the distribution actually commenced, and July 12, 1943. We know only that, at the beginning of that period, it had 1,157 shareholders, and that, during the eight years while normal business was not carried on, 1,150 of that 1,157 accepted par for their shares, leaving—under respondent's theory—but seven shareholders, who were also its directors. Using round figures, the association then had assets of the value of thirty-seven thousand dollars.

Under respondent's theory, these seven men owned these assets, and, upon a dissolution of the association, would not only be entitled to receive the par value of their shares, which, since each of them owned five, would aggregate thirty-five hundred dollars, but would also be entitled to divide, among themselves, the remaining $33,500. They would thus receive ten times more, for each of their shares, than the 1,150 shareholders received for each of theirs.

In justice to the seven shareholders and directors, it must be very clearly pointed out that they contemplate no dissolution or division of the assets among themselves. On the other hand, they desire, and have literally proposed, to resume business and invite the public to come in and share in that part of the fund ($33,500) which is the surplus over and above the amount of the par value of their shares. Conceding, as we do, that they are sincere in their belief that they are the only persons who have any legal or equitable interest in those assets, their proposal can only be regarded as most fair and generous; for, if the association be allowed to resume business, as they request, every single share issued to new shareholders from day to day would progressively diminish their individual interest in that surplus fund.

It is urged that to hold that the 1,150 shareholders who have participated in the distribution have an interest in the present assets, will create a highly confused situation. It is said that a considerable portion of these shareholders withdrew the par value of their shares as early as July, 1935, and that all of them withdrew prior to July, 1943. No doubt, a number of these persons have died, and their heirs or devisees will have to be determined. Other shareholders can only be located with great difficulty, if at all. Profoundly complex equitable questions will be presented and will probably have to be litigated, such as, for example: Shall a shareholder who withdrew his investments in 1935 participate equally with one who remained a shareholder in 1943, provided it appears that the surplus was accumulated in the later years of the eight-year period? It is said that, if a distribution must be made to the "ex-shareholders," the fund to be distributed will inevitably be largely, if not altogether, dissipated in determining such matters as above suggested, and that it would clearly be vastly more to the public interest to permit the respondent, which has established an enviable reputation by forty years of honorable and successful accomplishment, to resume business as contemplated by the resolution of July 12, 1943.

Much more is said to the same general effect, but, since these considerations go only to the question as to whether or not the supervisor's action, in refusing to approve the resolution, was wise or unwise, they are not relevant. This court can have no concern with the wisdom of the act in question, nor with its unwisdom, at least unless it appears that the act was so patently and glaringly unwise as to compel the inference that its performance can only be accounted for on the theory that it was arbitrary and capricious.

To appellants' contention that equitable rules governing the liquidation of funds owned in common should be applied, the respondent replies that it would be grossly inequitable to allow the 1,150 who withdrew their funds from the association to share equally with its seven shareholders and directors in a surplus which they provided by loyally keeping their own funds at risk. In other words, it is argued that

those who bear the risk of loss ought equitably to reap the benefit from any gain. But if the principles which govern the distribution of mutually owned funds are applicable to the distribution which took place in the instant case, the argument is completely answered in the *Francestown Savings Bank Case*, 63 N. H. 138.

If the question as to whether or not the shareholders who withdrew their funds after the adoption of the resolution of July 8, 1935, have any interest in the surplus now left in the inactive association had come here in a case wherein such a shareholder was asserting, as plaintiff, an interest in the fund as against the association, we would find it difficult to give an answer in which we had complete confidence. But that is not the question for decision in this case. The question here is: Can it rightly be held that the act of the supervisor, in refusing the respondent permission to resume business, was not one performed in the exercise of honest judgment but was arbitrary and capricious? Unless it can be so held, a court has no right to interfere with his performance of the duties which the legislature has assigned to him.

The judgment appealed from reads, in part, as follows:

"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the action of defendant Kingston Lister, as Supervisor of Savings and Loan Associations of the State of Washington, in refusing to approve said resolution of plaintiff Association adopted on July 12, 1943, set forth in paragraph XI of the Findings of Fact herein, is arbitrary and capricious and said Kingston Lister, as such Supervisor of Savings and Loan Associations of the State of Washington is hereby ordered and directed to formally approve within ten (10) days from the entry of this judgment said resolution."

This is followed by another paragraph in which it is ordered, adjudged, and decreed that the supervisor's failure to issue to the respondent a license to do business "was and is arbitrary and capricious," and he is thereby ordered and directed to issue such a license within ten days from the date of the judgment.

In our opinion, the reasons which have been assigned

for the supervisor's refusal to approve the resolution and issue the license to resume business are sufficiently strong and persuasive to preclude us from affirming the action of the trial court, in holding that the refusal was arbitrary and capricious. These reasons may be summarized as follows:

The legislative intent to give the supervisor of savings and loan associations plenary power and wide discretion in regulating every activity of such institutions is evident in substantially all of the one hundred twelve sections of the act governing their organization, management, supervision, and liquidation. As to liquidation, for example, it is provided that the supervisor may permit an association to voluntarily liquidate, if he so desires; but a liquidation so begun may be taken over by him at any time, wholly at his discretion. Furthermore, in case an involuntary liquidation is ordered by a court, it is provided that the supervisor shall be appointed liquidator by the court, "and no other person." In case the supervisor is removed as liquidator for failure to properly perform his duties, his office as supervisor is vacated, and his successor must be appointed to carry on the liquidation.

Furthermore, this court has repeatedly held that the controlling principle of savings and loan associations is mutuality among its shareholders; that all must fare alike; that all burdens shall be borne equally, and profits shared equally, in the absence of superior equities. *Rummens v. Home Sav. & Loan Ass'n, supra.* It would seem that the then supervisor must have had this principle clearly in mind when, in issuing the order of July 10, 1935, authorizing the distribution of assets as contemplated by the resolution of July 8th, he included therein the following:

"We interpret the order to mean that funds shall be distributed practically in the manner that liquidating dividends are distributed by an institution which in fact is in liquidation. In issuing this order, I reserve the right to order the discontinuance of emergency payments to members at any time it shall appear that a preference in ultimate payment might become imminent."

It does not appear that the respondent ever objected to, or protested against, these conditions.

The respondent association discontinued its normal activity on July 10, 1935. During the ensuing eight years, 1,150 of its 1,157 shareholders received the par value of their shares, and, during that period, the par value of outstanding Shares was reduced from $510,281.03 to a mere $3,500. The respondent characterizes this distribution, in its brief, variously as, "a curtailment of activities," "a sort of retrenchment proceeding," and "a sort of moratorium or tiding over to get its house in order." It seems to us, however, considering respondent's prolonged discontinuance of normal business, and the extreme point to which the distribution was voluntarily carried out, and the theory upon which the supervisor's order permitting the distribution was issued, that it can reasonably be characterized as a *de facto* liquidation.

We feel compelled to hold that the evidence does not establish that the act of Supervisor Lister, in refusing to approve the resolution of July 12, 1943, was arbitrary and capricious, and the judgment and decree, being wholly based upon that theory, must, therefore, be reversed. In view of this disposition of the matter, it becomes unnecessary to discuss the other questions raised by appellants.

Assuming, as we do, that that refusal of the former supervisor to issue the respondent a license to do business in 1943 is not *res judicata,* we think it proper to add that nothing we have said in this opinion is intended to restrict his freedom of action in case the respondent should now renew its application for a license to resume business. To put it in another way, we merely decide that the act of his predecessor in office, in refusing to approve the respondent's resolution of July 12, 1943, and license it to resume business, could not be nullified by a reviewing court as being arbitrary and capricious.

The judgment appealed from is reversed.

BEALS, SIMPSON, and MALLERY, JJ., concur.

BLAKE, J., concurs in the result.